**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**REBECCA KAY MCCOMAS,**

     **Plaintiff,**

**v.**                                                            **Case No.: 2:17-cv-00083**

**NANCY A. BERRYHILL,
Acting Commissioner of the
Social Security Administration,**

     **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATIONS

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Claimant's application for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The case is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 9, 10).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's motion for judgment on the pleadings be **DENIED**; that the Commissioner's decision be

1

**AFFIRMED**; and that this case be **DISMISSED** and removed from the docket of the Court.

## I.  Procedural History

Rebecca Kay McComas, previously Nelson, ("Claimant") filed an application for SSI benefits on April 2, 2012, alleging a disability onset date of May 18, 2001, (Tr. at 275-96), due to chronic obstructive pulmonary disease ("COPD"), chronic back pain, chronic cervicalgia, chronic bilateral knee pain that is worse on the left, chronic bilateral elbow pain, generalized anxiety disorder, bulging discs in her neck, "disintegrating gel in [her] middle back," and asthma. (Tr. at 327). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 142, 160). Consequently, Claimant filed a request for an administrative hearing. Claimant had an administrative hearing on January 7, 2015 and a supplemental hearing on April 17, 2015[1] before the Honorable Robert M. Butler, Administrative Law Judge ("ALJ"). (Tr. at 27-102). By written decision dated June 26, 2015, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-21). The ALJ's decision became the final decision of the Commissioner on November 4, 2016, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 7, 8). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 9). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No.

---

[1] Claimant amended her alleged onset date to March 2, 2014, the date of her fiftieth birthday, at the supplemental hearing. (Tr. at 32, 320).

10). Consequently, the matter is fully briefed and ready for resolution.

## II.  **Claimant's Background**

Claimant was 50 years old on her amended alleged onset date. (Tr. at 32, 320). She was educated through the eighth grade, communicates in English, and previously worked as a home health aide. (Tr. at 57, 68, 326, 328).

## III.  **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 416.920(b). If the claimant is not engaged in substantial gainful employment, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 416.920(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 416.920(d). If so, then the claimant is found disabled and awarded benefits.

However, if the impairment does not meet or equal a listed impairment, under the fourth step the adjudicator must determine the claimant's residual functional capacity

("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 416.920(e). After making this determination, the ALJ must ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity, when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 416.920(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger,* 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. § 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 416.920a(b). If an impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in the regulations. *Id.* § 416.920a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* § 416.920a(d). A rating of "none" or "mild" in the first

three functional areas (limitations on activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental function. 20 C.F.R. § 416.920a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

*Id.* § 416.920a(e)(4).

In this case, the ALJ confirmed at the first step of the sequential evaluation that Claimant had not engaged in substantial gainful activity since March 2, 2014, the amended alleged onset date. (Tr. 14, Finding No. 1). At the second step of the evaluation, the ALJ determined that Claimant had the following severe impairments: "chronic obstructive pulmonary disease, lumbar, cervical, and thoracic degenerative disc disease with radiculopathy, and myofascial pain syndrome." (*Id.,* Finding No. 2). The ALJ considered Claimant's additional alleged impairments of hypertension, generalized

anxiety disorder, depression, and thyroid nodules, but found that those conditions did not more than minimally interfere with her ability to perform work-related activity for a sufficient duration during the relevant period; therefore, the ALJ determined that the impairments were non-severe. (Tr. at 14-15). Under the third inquiry, the ALJ concluded that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 15, Finding No. 3). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform a range of light work as defined in 20 CFR 416.967(b) consisting of: lifting up to 20 pounds occasionally and 10 pounds frequently, standing and walking for about 6 hours, and sitting for up to 6 hours in an 8-hour workday. The claimant is able to sit no more than 60 minutes at one time and stand no more than 30 to 60 minutes at one time. The claimant is able to occasionally crawl, crouch, kneel, stoop, balance, and climb ramps, stairs, ladders, ropes or scaffolds. The claimant is able to perform work that does not involve concentrated exposure to extreme cold, extreme heat, humidity, excessive vibration, unprotected heights, use of moving machinery, chemicals, poorly ventilated areas, or environmental irritants such as fumes, odors, dusts and gases.

(Tr. at 16-19, Finding No. 4). At the fourth step, the ALJ determined that Claimant was unable to perform any past relevant work. (Tr. 20, Finding, No. 5). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work-related experience, age, and education in combination with her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 20, Finding Nos. 6-9). The ALJ considered that (1) Claimant was born in 1964, and was 50 years old, defined as an individual closely approaching advanced age, on the amended alleged disability onset date; (2) she had a limited education and could communicate in English; and (3) transferability of job skills was not material to the determination because the Medical-Vocational Rules supported a finding that Claimant was "not disabled" regardless of whether she had transferable skills. (Tr. at 20, Finding

Nos. 6-8). Taking into account these factors, Claimant's RFC, and the testimony of a vocational expert, the ALJ determined that Claimant could perform jobs that exist in significant numbers in the national economy, including unskilled work as a garment bagger, inspector, and sorter at the light exertional level. (Tr. at 20-21, Finding No. 9). Therefore, the ALJ concluded that Claimant had not been under a disability, as defined in the Social Security Act, since March 2, 2014, the amended alleged onset date. (Tr. at 21, Finding No. 10).

## IV.  **Claimant's Challenges**

Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ did not properly consider the severity of her limitations in determining her RFC. (ECF No. 9 at 5). Claimant asserts that the objective evidence reflects that she suffers from COPD, degenerative joint disease involving multiple joints, back pain and spasms, fatigue, major depressive disorder, pain disorder, generalized anxiety disorder, and a poor mental prognosis. (*Id.*). Claimant states that the foregoing impairments prevent her from participating in any substantial gainful activity on a sustained and competitive basis and "certainly not at a level exceeding sedentary work."[2] (*Id.* at 5-6). Claimant further contends that the evidence of record shows that she would be absent or off-task in excess of acceptable tolerances, which the vocational expert confirmed would preclude her from working. (*Id.* at 5-6).

In response to Claimant's challenges, the Commissioner posits that the ALJ properly considered all of the evidence and thoroughly articulated his reasoning for the

---

[2] Claimant explains that if the ALJ limited her RFC to sedentary work, it would have directed a finding that she was disabled on her amended her alleged onset date under Rule 201.09 of the Medical Vocational Guidelines (the "Grids"). (*Id.* at 6).

RFC finding. (ECF No. 10 at 15). Moreover, as to Claimant's assertion that the ALJ's analysis of her impairments was "fatally flawed," the Commissioner notes that Claimant did not identify any evidence that the ALJ failed to consider or any credibly-established functional limitations that conflicted with the ALJ's RFC finding. (*Id.* at 15-16). In addition, the Commissioner states that the ALJ was not required to accept the vocational expert's testimony that a person could not work if he or she was off-task or absent in excess of customary tolerances because the evidence did not support that Claimant had such limitations, including the fact that none of Claimant's treating physicians opined that Claimant had any work-preclusive or functional limitations as a result of her impairments. (*Id.* at 17). The Commissioner argues that substantial evidence supports the ALJ's RFC finding that Claimant was capable of a limited range of light work. (*Id.* at 18-19).

## V.     **Relevant Medical History**

The undersigned has reviewed the transcript of proceedings in its entirety, including the medical records in evidence. However, the following summary is limited to those entries most relevant to the issues in dispute.

### A. Treatment Records

Claimant began complaining of low back pain many years before her alleged onset of disability. In September 2002, Claimant's primary care physician, Anita T. Dawson, D.O., referred her to physical therapy. (Tr. at 895). At that time, Claimant reported that she had suffered back pain for the past five years; in addition, she complained of a new onset of radicular pain in both of her legs and feet. (Tr. at 897). Claimant participated in four sessions of physical therapy over the course of two months. Although Claimant "objectively seemed to be doing well," she continued to complain of low back pain that

radiated to her legs and feet. (Tr. at 895). In view of her continued symptoms and lack of progress, Claimant's physical therapist discontinued therapy. Claimant was advised to continue with a home exercise program. (*Id.*). In April 2012, Claimant's new primary care physician, Gregory Chaney, M.D., again referred her to physical therapy for low back pain. (Tr. at 889). Claimant had six office visits in one month. However, during a physical therapy appointment on May 21, 2012, Claimant reported that she "had an accident" two days earlier and had significant stiffness and pain in her cervical and lumbar spine. (Tr. at 892).

Thereafter, in the year preceding Claimant's alleged onset of disability, Claimant had x-rays of her spine at St. Mary's Medical Center on March 27, 2013. The x-rays were compared to prior x-rays taken of Claimant's spine in May 2008. (Tr. at 886-88). The lumbar spine x-ray showed stable levoscoliosis, with no spinal instability, but reflected progressive degenerative changes, more posteriorly than anteriorly, since May 2008. (Tr. at 886). Her cervical spine x-ray also showed progressive degenerative changes since May 2008, including degenerative changes with bilateral neural foraminal stenosis. However, the degenerative retrolisthesis at C5-6 was stable. (Tr. at 887). Finally, her thoracic spine x-ray revealed mild degenerative changes similar to what was seen in May 2008. (Tr. at 888).

On May 1, 2013, Claimant saw Rebecca A. Conaway, CFNP, for a gynecological examination. (Tr. at 917). Claimant admitted that she continued to smoke every day, averaging less than a pack of cigarettes per day. (918.). Claimant denied having fatigue, anxiety, depression, back pain, muscle aches, or localized joint pain or stiffness. (Tr. at 917-19). However, Claimant reported shortness of breath, coughing, and wheezing. (Tr. at 919). On examination, Claimant's oxygen saturation was 93 percent, and her

cardiovascular, musculoskeletal, and neurological examinations were normal. (*Id.*).

On June 12, 2013, Claimant underwent a spirometry test at St. Mary's Medical Center ordered by her pulmonologist, Kerri G. Donahue, M.D.[3] Claimant's results were consistent with moderately severe obstruction with possible restriction. (Tr. at 885). By this time, Claimant had smoked for 35 years and was smoking two packs of cigarettes per day. (*Id.*). She complained of shortness of breath after exertion, a non-productive cough, and frequent wheezing. (*Id.*). The following month, on July 9, 2013, Claimant had nerve conduction and electromyography studies ordered by Dr. Chaney, which revealed normal results. (Tr. at 870-71).

On August 27, 2013, Claimant saw Dr. Donahue at Huntington Internal Medicine Group regarding Claimant's history of COPD, tobacco abuse, and nocturnal hypoxemia. (Tr. at 922, 924). Claimant continued to smoke, but now smoked less than a pack of cigarettes per day. (922.). Her oxygen saturation was 96 percent. (Tr. at 923). Although Claimant had a moderate bilateral decrease in breath sounds, she reported that her shortness of breath was "about the same;" that she walked her dog approximately one mile several days per week and did fairly well walking that distance; she had occasional episodes of wheezing, but denied having a productive cough; and she continued to use her bronchodilator inhalers as prescribed, used her rescue inhaler approximately three times per week, used supplemental oxygen at a rate of two liters per minute via a nasal cannula at night, and took Wellbutrin for depression. (Tr. at 923-24). Dr. Donahue assessed Claimant with COPD, tobacco abuse, and hypoxemia. (Tr. at 924-25). She noted that

---

[3] "Spirometry is a common office test used to assess how well your lungs work by measuring how much air you inhale, how much you exhale and how quickly you exhale." http://www.mayoclinic.org/tests-procedures/spirometry/home/ovc-20346849.

Claimant's FEV1 value was reduced by 15 percent in her June 12, 2013 pulmonary function study, although the reason for the decrease was unclear. On overall examination, Claimant appeared stable. (Tr. at 925). The plan was for Claimant to continue her current medication regimen and she was counseled to quit smoking. (*Id.*).

On September 12, 2013, Claimant presented to the emergency room at St. Mary's Medical Center. (Tr. at 857). Her chief complaints were shortness of breath, COPD, and left hip pain. (*Id.*). Claimant stated that the shortness of breath was severe and worsened with walking. She also experienced coughing and wheezing. (*Id.*). However, Claimant reported that she was breathing better now that she was in air conditioning, stating that she had been living in a camper without air conditioning since her husband "kicked her out" approximately four months earlier. (*Id.*). Claimant's oxygen saturation was 96 percent in room air. (Tr. at 858). On examination, Claimant was not in respiratory distress, but expiratory wheezes were present, and she had tenderness in her left lower lumbar area. (*Id.*). Claimant's EKG was normal; her chest x-rays showed no radiographic evidence of acute cardiopulmonary disease; and her left hip x-rays did not show any evidence of acute osseous abnormality. (Tr. at 858-59, 862-64). The emergency room physician diagnosed Claimant with COPD and left-sided sciatica without sensory loss or motor deficit. (Tr. at 861). Claimant was prescribed prednisone and instructed to continue her current medications and follow up with Dr. Chaney. (*Id.*).

On September 20, 2013, Claimant saw Nurse Conaway for a gynecological consultation. (Tr. at 926). Claimant denied having any malaise, neck or muscle pain, localized joint pain or stiffness, anxiety, or depression. (Tr. at 927-28). Her oxygen saturation was 98 percent. (Tr. at 928). Claimant then saw primary care physician, Erica D. Barringer, D.O., as a new patient on October 15, 2013. Here complaints included neck

and lower back pain that was worse on the left side. (Tr. at 931). Claimant's oxygen saturation was 96 percent; her lungs were clear to auscultation; her balance, gait, and stance were normal; and her psychiatric examination revealed normal appearance and behavior, euthymic mood, normal affect, and no impairment in thought processes or content. (Tr. at 933-34). Claimant continued to smoke every day, but was able to go for walks once or twice per week and was self-reliant in her usual daily activities, except that she needed help with the laundry. (Tr. at 935). Dr. Barringer diagnosed Claimant with hyperlipidemia and sciatica. (Tr. at 934). She was referred to a pain management clinic because Dr. Barringer "did not manage chronic pain." (Tr. at 934-35.).

Claimant again saw Ms. Conaway on November 22, 2013 for a gynecological examination. (Tr. at 936). Claimant continued to smoke less than a pack of cigarettes per day. (Tr. at 937). Her oxygen saturation was 98 percent. (Tr. at 938). Claimant denied shortness of breath, coughing, or wheezing, and her lungs were clear to auscultation. (Tr. at 938-39).

On December 4, 2013, Claimant saw Ahmet "Ozzie" Ozturk, M.D, and Pamela Rice-Jacobs, CFNP, at the Cabell Huntington Hospital Pain Management Center for an evaluation of her low back pain with intermittent pain radiating down her left leg to her ankle. (Tr. at 810). She stated that the pain began one year earlier and had gradually worsened. (811.). Claimant described the pain as dull and aching, sharp and stabbing, "electric like" shooting, and constant, occurring several times per day. (*Id.*). Claimant further stated that the pain was worse in the morning and decreased later in the day and at night; it decreased when she bent forward or backward, but increased when she reclined, lay down, stood, walked, sat, or drove/rode in a car; it was usually an "8" out of "10," but was a "9" at its worst. (Tr. at 810-11). Claimant also reported shortness of breath,

asthma, wheezing that required use of oxygen at night, emphysema, COPD, arthritis/osteoarthritis, muscle pain and aching, morning tiredness, and fatigue. (Tr. at 812-13). The x-rays of Claimant's lumbar spine showed multilevel degenerative changes without associated listhesis or translation. (Tr. at 814). Dr. Ozturk documented that Claimant did not require an assistive advice to stand or ambulate. On examination, her spine was midline with normal curvature; she did not have shoulder depression, pelvic tilt, or paraspinal muscle spasm; her gait was non-antalgic; and she could walk on her heels and toes without difficulty or pain. (*Id.*). Claimant's lumbar flexion was 80 degrees, her lumbar extension was 10 degrees, and her lateral flexion was 25 degrees on the right and 30 degrees on the left, indicating some restriction of lumbar rotation bilaterally. (*Id.*). Claimant reported segmental pain in her lumbar spine at L4-5 and L5-S1, as well as pain in the left lower facets. (815.). Her left sacroiliac joint was painful on palpation, and she had a few significant trigger points in her muscles. (*Id.*). In her lower extremities, Claimant did not have any joint swelling; her movements were unrestricted and non-painful; and she had full muscle strength. (*Id.*). Her straight leg raising test was positive for back pain on the left, and the Lasegue test was negative. (*Id.*). The modified Gaenslen test was positive on the left. (*Id.*). Claimant's respiratory examination did not reveal any issues. (Tr. at 816).

Dr. Ozturk's impression was that Claimant suffered from lumbar spondylosis on the left side of her body, sacroiliac joint syndrome on the left, and myofascial pain syndrome. (*Id.*). Her primary source of pain was the posterior elements of her lumbar spine, including her sacroiliac and facet joints, but disc pain was a possible component. (*Id.*). Dr. Ozturk recommended two nerve block injections in the lateral branches of Claimant's left sacroiliac joint and two injections in her left lumbar facet, a prescription

for Lyrica, physical therapy, psychological evaluations, and smoking cessation. (*Id.*). Dr. Ozturk noted that if Claimant's nerve blocks did not provide relief, a provocative discography or epidural could be considered. (*Id.*).

On December 16, 2013, Claimant failed to appear for her scheduled appointment with Dr. Ozturk, without explanation. (Tr. at 847). She also canceled her nerve block procedure scheduled with Dr. Ozturk on December 30, 2013. (Tr. at 848). On January 10, 2014, Dr. Ozturk gave Claimant nerve block injections on the left at L5 through S2 for her sacroiliac joint syndrome. (Tr. at 836, 841, 849-51). Thereafter, Claimant canceled or failed to appear for four scheduled appointments in January and February 2014. She was dismissed from the pain management clinic for non-compliance. (Tr. at 852-53).

On February 18, 2014, Claimant saw Dr. Donahue for follow up regarding her COPD. (Tr. at 941). Claimant continued to smoke cigarettes every day. (*Id.*). She complained of paroxysmal nocturnal shortness of breath and leg pain when walking. (Tr. at 942). Claimant's oxygen saturation was 97 percent. (*Id.*). Claimant stated that her shortness of breath was "about the same" and she was able to walk on a daily basis for exercise. (Tr. at 943). She denied having a productive cough, but reported that she experienced occasional wheezing, which mostly occurred in the morning. (*Id.*). Claimant also stated that she felt less depressed since starting Wellbutrin. (*Id.*). Claimant confirmed that she continued to use her inhalers and wear a nasal cannula dispensing supplemental oxygen at night. (*Id.*). On examination, Claimant had a moderate decrease in breath sounds bilaterally. (*Id.*). Dr. Donahue's assessment was COPD, hypoxemia, depression, anxiety, and tobacco abuse. (*Id.*). Dr. Donahue noted that Claimant's COPD was stable; therefore, she was to continue her current medications. (*Id.*). Claimant was encouraged to quit smoking. A spirometry test was scheduled to assess her current lung

function. (*Id.*). Claimant was also encouraged to continue the prescribed medications for her other assessed conditions. (Tr. at 943-44).

On April 3, 2014, Claimant saw Christina Booda Gillenwater, M.D., at Marshall Health for the purpose of establishing primary care. (Tr. at 530). Claimant reported that she previously went to a pain clinic for her left-sided sciatic nerve pain, but she missed an appointment due to snow and was dismissed from the clinic. (*Id.*). Claimant stated that she was out of Neurontin, which helped ease her pain, and would like it refilled. (*Id.*). As for her COPD, Claimant stated that she saw Dr. Donahue and took a lot of medications, including Theophylline, but she continued to smoke three packs of cigarettes per day. (*Id.*). Claimant denied chest pain or discomfort, cough, or dyspnea; her oxygen saturation was 98 percent; and the examination of her lungs and cardiovascular system did not reveal any abnormal results. (Tr. at 531-32). Dr. Gillenwater assessed Claimant with sciatica and chronic pain. She gave Claimant a prescription of Neurontin for pain relief. (*Id.*).

On June 18, 2014, Claimant saw Dr. Gillenwater for a follow-up appointment. (Tr. at 527). Claimant reported that Neurontin was "helping a lot," although she had walked a great deal the day before and her pain was worse. (*Id.*). Claimant requested a prescription of Ultram to be taken in between Neurontin. (*Id.*). Her active problems included COPD, chronic pain, fatigue, nicotine dependence, nontoxic multinodular goiter, and sciatica. (*Id.*). Claimant denied chest pain or discomfort and shortness of breath. (*Id.*). Her respiratory and cardiovascular examinations were normal, but her musculoskeletal examination revealed spasms in her paraspinal muscles surrounding her lumbosacral spine. (Tr. at 528). Dr. Gillenwater assessed Claimant with sciatica, back muscle spasms, back pain, and nicotine dependence. (*Id.*). Claimant was told that she "need[ed] to quit

smoking." (*Id.*). Ultram and Flexeril were ordered for Claimant's back pain, and she was advised to continue doing stretching exercises. (*Id.*).

On July 14, 2014, Claimant saw Robin Tolbert, D.O., at Marshall Health walk-in clinic for muscle spasms and pain in the left side of her back. (Tr. at 524). She stated that the Flexeril was "helping a lot more" for those issues. (*Id.*). Claimant's active problems included back muscle spasm, back pain, COPD, chronic pain, fatigue, nicotine dependence, nontoxic multinodular goiter, and sciatica. (Tr. at 524). She smoked one pack of cigarettes per day. (Tr. at 525). On examination, Claimant's cardiovascular system and lungs were normal. Her lumbosacral spine was normal in appearance, exhibiting no muscle spasms, with normal motion and no pain elicited by motion. Palpation of the spine revealed no abnormalities. (Tr. at 525-26). Dr. Tolbert's assessment was back muscle spasm. (Tr. at 526). Claimant's Flexeril was increased and her prescriptions for Neurontin and Ultram were refilled. (*Id.*). Claimant was told to follow up with her primary care physician, Katherine Steele, M.D., with whom Claimant had her first scheduled appointment in August 2014. (Tr. at 524, 526).

On August 1, 2014, Claimant had a spirometry lung function study at St. Mary's Medical Center, ordered by Dr. Donahue. (Tr. at 856). Claimant admitted to smoking two packs of cigarettes per day. (*Id.*). The results of Claimant's pulmonary function study were consistent with a mild obstructive ventilator defect. (*Id.*). On August 6, 2014, Claimant saw Dr. Donahue for follow up regarding her COPD and spirometry test. (Tr. at 949). She reported smoking less than a pack of cigarettes per day. (*Id.*). Claimant complained of shortness of breath, asthma, pain in her legs when walking, joint pain, arthritis, and back pain. (Tr. at 950). On examination, Claimant's oxygen saturation was 96 percent, and she had a mild decrease in her breath sounds bilaterally. (Tr. at 950-51). Claimant stated that

she was walking a lot more since her last visit due to lack of transportation, but felt it was helping her significantly. (951.). Claimant reported that her shortness of breath was "the same" and she still experienced occasional wheezing and a non-productive cough. (*Id.*). She continued to use her inhalers, but had stopped using supplemental oxygen at night because the machine made it too hot in her small trailer. (*Id.*). Claimant's spirometry test during this visit showed a mild obstructive ventilator defect. (Tr. at 952). Dr. Donahue assessed Claimant with COPD, hypoxemia, depression, anxiety, and tobacco abuse. (*Id.*). Dr. Donahue noted that Claimant's peak flow in her pulmonary function test was "significantly better" than in her previous testing. (*Id.*). She recommended that Claimant continue to use her inhalers, resume using supplemental oxygen at night, and continue taking her prescribed medications for depression and anxiety. (*Id.*).

On August 12, 2014, Claimant saw Dr. Steele at Marshall Health to establish primary care. (Tr. at 520). Claimant reported a cough, without shortness of breath; she had back pain and spasms, as well as limping, but no neck pain; and she had tingling, but no headache, paresthesia, or leg weakness. (*Id.*). On examination, Claimant's gait and station were normal. She did not have any bony abnormalities to palpation, but she had trigger point pain in her left lumbar paraspinal musculature and pain with straight leg raising on the left (Tr. at 522-23). Her active problems included COPD, chronic pain, fatigue, nicotine dependence, nontoxic multinodular goiter, sciatica, and back pain and spasm. (Tr. at 520). Claimant's current medications included albuterol sulfate, Spiriva, and Symbicort inhalers; Wellbutrin; Flexeril; Neurontin; Klonopin; Singulair, Theophylline; and Ultram. (Tr. at 521).

On October 10, 2014, Claimant presented to Kara Siford, M.D., at Marshall Health, reporting that she had fallen in her bathroom five days earlier and struck her left flank.

(Tr. at 516). She stated that she fell occasionally, but could not provide a reason, indicating that she was not confused, dizzy, or lightheaded when she fell. (*Id.*). Claimant complained of constant pain on her left side that was worse when she breathed or coughed. (*Id.*). She reported increasing her dosage of Ultram and Neurontin to treat the pain. (*Id.*). Otherwise, Claimant admitted that she continued to smoke, averaging one-half pack of cigarettes per day, and complained of shortness of breath and coughing, but denied wheezing. (*Id.*). Her physical examination was unremarkable other than a two centimeter bruise on the left flank. (Tr. at 518). Dr. Siford diagnosed Claimant with a probable musculoskeletal injury for which she was advised to take ibuprofen and use a heating pad. (Tr. at 518-19). Claimant was also advised to stop taking more than her prescribed dosage of Ultram and Neurontin. (Tr. at 516, 519).

On November 12, 2014, Claimant saw Dr. Steele for back pain and a flu vaccination. Claimant reported that Flexeril was working and she was also taking Ultram as needed. She requested an increase in dosage of Ultram. (Tr. at 511). Claimant denied shortness of breath, but reported having muscle spasms in her back, limping, and pain in the distal interphalangeal joints in her hands. (*Id.*). Her respiratory and cardiovascular physical examination was unremarkable, and her gait and station were normal. (Tr. at 513-14). However, Dr. Steele identified by palpation a myofascial trigger point in Claimant's left paraspinal muscle in which Dr. Steele injected Celestone and Lidocaine. (Tr. at 514). In order to assess the benefit of the steroid injection with accuracy, Dr. Steele instructed Claimant to reduce her intake of Ultram after a period of three to four days. (*Id.*).

**B. Evaluations and Opinions**

On March 11, 2013, Lester Sargent, M.A., performed an adult mental status examination of Claimant for the West Virginia Disability Determination Service. At the

time of the examination, Claimant exhibited a slumped posture and a slow gait. She stated that she stopped working as a home health aide for elderly patients in 2001 because her back hurt and she "could not take the pain anymore." (Tr. at 450-51). Claimant said that her back pain was now worse and persisted every day; her legs hurt, particularly her left leg; she had COPD; her hands hurt due to carpal tunnel syndrome; she had depression for at least ten years and was on medications for the past two years; and she also worried all of the time. (*Id.*). As to her social functioning and daily activities, Claimant reported that she ran errands, talked on the telephone, attended medical appointments, performed household chores in short intervals, and took short walks for exercise. (Tr. at 454). However, Claimant stated that she did not visit with friends or family members, attend social functions, or maintain any close friendships. (*Id.*). On examination, Claimant had fair eye contact; coherent and, at times, loquacious speech; orientation in all spheres; sad and anxious mood; mildly restricted affect; normal thought processes and content; fair insight; normal immediate memory and pace; mildly deficient judgment, remote memory, concentration, persistence, and social functioning; and moderately deficient recent memory. (Tr. at 453). Mr. Sargent's diagnosed Claimant with recurrent moderate major depressive disorder; pain disorder associated with both psychological factors and a general medical condition; and generalized anxiety disorder. (*Id.*).

On March 28, 2013, Rakesh Wahi, M.D., performed a consultative examination of Claimant for the West Virginia Disability Determination Service. Claimant reported to Dr. Wahi that she suffered from COPD for several years, which caused shortness of breath after she walked one-half of a mile. (Tr. at 496). She stated that she had a frequent cough without production of any sputum, was on a combination of several bronchodilators, and used a rescue inhaler once or twice per week. (*Id.*). Claimant also reported suffering from

neck pain since being rear-ended in a car accident six years earlier. (*Id.*). Claimant stated that she experienced pain when turning her head from side-to-side or to any extreme position and felt a cracking sensation, but she did not attribute any significant restrictions to her neck symptoms. (*Id.*). Further, Claimant reported to Dr. Wahi that she had pain in most of her joints, including her knees and back. (Tr. at 497). She stated that her back pain prevented her from standing for longer than 30 minutes and she spent most of her day sitting and watching television, noting that she did not have any significant limitation in her ability to sit. (*Id.*). Otherwise, Claimant stated that she slept well and could lift 20 pounds, dress herself, shower, grocery shop, and perform some housework. (*Id.*). As far as mental limitations, Claimant reported a mild degree of anxiety, but did not express any significant symptoms associated with the condition. (*Id.*). Claimant's respiratory examination was normal, although she continued to smoke one-half pack of cigarettes per day. (Tr. at 497-98). She had normal gait and station, sensation and reflexes, and range of motion in her extremities. She could get on and off of the examination table, fully extend both hands, make fists, and oppose her fingers; her fine manipulation was intact; and she had full muscle and grip strength. (Tr. at 499). Claimant had normal range of motion in her cervical spine, but her lumbar spine showed flexion and extension of 80 degrees and lateral flexion of 20 degrees. (*Id.*). Dr. Wahi noted that Claimant had some loss of motion in her lumbar spine, which decreased her ability to walk and stand; however, she walked without an assistive device and was able to perform her activities of day-to-day living. (Tr. at 500). X-rays of Claimant's left knee showed no significant degenerative process. A pulmonary function study showed very mild restrictive pulmonary disease. (Tr. at 501-05). Dr. Wahi's impression was that Claimant suffered from COPD and degenerative joint disease involving multiple joints. (Tr. at 499).

On April 16, 2013, Caroline Williams completed a RFC assessment based upon a review of Claimant's records.[4] Dr. Williams opined that Claimant could occasionally lift or carry 50 pounds; frequently lift or carry 25 pounds; and stand, walk, or sit with normal breaks for a total of 6 hours in an 8-hour workday. (Tr. at 134). She further assessed that Claimant could frequently climb ramps or stairs, balance, stoop, kneel, or crouch and occasionally climb ladders, ropes, or scaffolds or crawl. (Tr. at 135). Dr. Williams did not find that Claimant had any manipulative, visual, or communicative limitations. (*Id.*). However, Dr. Williams noted that Claimant should avoid concentrated exposure to extreme temperatures, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and hazards such as machinery or heights. (Tr. at 135-36). Dr. Williams stated that Claimant's alleged symptoms were not fully credible, as they were inconsistent with the medical evidence in the file and Claimant's activities of daily living. (Tr. at 133). Fulvio Franyutti, M.D., affirmed Dr. Williams's assessment on September 10, 2013. (Tr. at 154).

On April 16, 2013, Paula J. Bickham, Ph.D, completed a Psychiatric Review Technique form based upon her review of Claimant's records. Dr. Bickham found that Claimant did not meet the listings for affective, anxiety-related, or somatoform disorders. (Tr. at 132). She further opined that Claimant had mild restriction in activities of daily living and maintaining social functioning; moderate difficulty in maintaining concentration, persistence, or pace; and no episodes of decompensation of extended duration. (*Id.*). Dr. Bickham found that Claimant was moderately limited in understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration for extended periods; and responding appropriately to

---

[4] At the time of Dr. Williams's review, Claimant's alleged onset date was May 18, 2001. (Tr. at 126).

changes in the work setting. (Tr. at 137-38). However, Dr. Bickham noted that in Claimant's previous application for SSI, the ALJ determined on July 15, 2010 that Claimant had the foregoing moderate limitations, and Dr. Bickham gave that decision controlling weight. (Tr. at 138). Dr. Bickham stated that Claimant retained "the ability to learn and perform routine one to two step work-like activity in an environment with few distractions." (*Id.*). Dr. Bickham found Claimant to only be partially credible, explaining that Claimant had a history of mental health treatment and was on medication for the past two years; however, she did not need reminders to perform activities of daily living; she prepared light meals, performed some household cleaning, drove, went out in public alone, bought groceries, and handled all of her finances. (Tr. at 132). Jeff Harlow, Ph.D., affirmed Dr. Bickham's opinions on September 6, 2013, noting that there was no evidence of new mental health treatment since Dr. Bickham's assessment. (Tr. at 150-51, 156).

### C. Claimant's Statements

At the supplemental administrative hearing on April 17, 2015, Claimant testified that she continued to smoke and conceded that she could probably quit if she really tried. (Tr. at 36-37). She stated that she tried to stop smoking by taking Wellbutrin, but after a month and a half, she became depressed and resumed smoking. (Tr. at 47). Claimant also tried nicotine patches, but admitted that she did not try hard enough to stop smoking. (*Id.*). Claimant also testified that she ceased taking medication for mental impairments in November 2014. (Tr. at 38-39). She stated that she experienced varying degrees of back pain every day for the past 21 years and became unable to continue working as a home health care aide in 2010, primarily because of the lifting and bending requirements. (Tr. at 42-44). She rated her pain a "3" or "4" out of "10" on average and "5" or "6" out of "10" at its worst. (Tr. at 45). Claimant stated that Ultram and Neurontin helped ease the pain,

but did not eliminate it. (*Id.*). As far as her breathing issues, Claimant stated that she often walked her dog up to a mile, which seemed to help. (Tr. at 46). However, she could not stand, walk, or sit for 6 hours in an 8-hour workday due to shortness of breath and back pain. (Tr. at 47-48). She added that if she could take breaks from sitting and move around, she could probably resume whatever task she was doing. (Tr. at 48). Claimant stated that she lived alone since her divorce in May 2013 and performed her own household chores, as well as drove. (Tr. at 50-51, 55). She testified that she could lift a 10-pound bag of potatoes, but could not lift her 30-pound grandchild. (Tr. at 53).

## VI.  **Standard of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In Blalock v. Richardson, the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). This Court is not charged with conducting a *de novo* review of the evidence. Instead, the Court's function is to scrutinize the record and determine whether it is adequate to support the conclusion of the Commissioner. *Hays*, 907 F.2d at 1456. When conducting this review, the Court does not re-weigh evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001) (citing *Hays*, 907 F.2d at 1456)). Moreover, "[t]he fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of §

205(g) ... requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" *Blalock*, 483 F.2d at 775 (citations omitted). Thus, the relevant question for the Court is "not whether the claimant is disabled, but whether the ALJ's finding of no disability is supported by substantial evidence." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig*, 76 F.3d at 589).

## VII.   **Discussion**

Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ's RFC evaluation did not properly consider the severity of limitations flowing from Claimant's COPD, degenerative joint disease involving multiple joints, back pain and spasms, fatigue, major depressive disorder, pain disorder, generalized anxiety disorder, and poor mental prognosis. (ECF No. 9 at 5). Claimant contends that the evidence shows that she would be absent or off-task in excess of acceptable tolerances, which would preclude her from working based on the testimony of the vocational expert. (*Id.* at 5-6). Further, she argues that a "reasonable view of the evidence" shows that she is incapable of working at any exertional level and certainly not capable of performing anything more than sedentary work, which would have directed a finding that she was disabled on her fiftieth birthday under the "Grids."[5] (*Id.* at 6).

---

[5] The Grids "contain numbered table rules which direct conclusions of 'disabled' or 'not disabled' where all of the individual findings coincide with those of a numbered rule." SSR 83-12, 1983 WL 31253, at *1; *see* 20 C.F.R. Pt. 404, Subpart P, Appendix 2. The Grids are intended to be used at the fifth step of the sequential process, for "cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work." 20 C.F.R. Pt. 404, Subpt. P, App'x 2 § 200.00. Thus, in determining whether there are jobs that exist in significant numbers in the national economy, the ALJ may rely upon the Grids "which take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); s*ee also* 20 C.F.R. §§ 404.1569, 416.969.

Social Security Ruling ("SSR") 96-8p provides guidance on how to properly assess a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *1. RFC is a measurement of the **most** that a claimant can do despite his or her limitations resulting from both severe and non-severe impairments, and the finding is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. The functions that the ALJ must assess include the claimant's physical abilities, "such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping or crouching);" mental abilities; and other abilities, "such as skin impairment(s), epilepsy, impairment(s) of vision, hearing or other senses, and impairment(s) which impose environmental restrictions." 20 CFR § 416.945(b-d). Only by examining specific functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." SSR 96-8p, 1996 WL 374184, at *3. Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that

he or she does not actually have." *Id.* at *4.

In determining a claimant's RFC, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." *Id.* at *7. Further, the ALJ must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. "Remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Mascio v. Colvin*, 780 F.3d 632, 636 (4th Cir. 2015) (quoting *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013)) (markings omitted).

Nonetheless, the scope of "judicial review in social security cases is quite limited." *Smith v. Colvin*, No. 1:14-29870, 2016 WL 1249270, at *1 (S.D.W. Va. Mar. 29, 2016). "When reviewing a Social Security disability determination, a reviewing court must uphold the determination when an ALJ has applied correct legal standards and the ALJ's factual findings are supported by substantial evidence." *Cuffee v. Berryhill*, No. 15-2530, 2017 WL 715070, at *2 (4th Cir. Feb. 23, 2017) (internal citations and markings omitted). Substantial evidence is that which "a reasonable mind might accept as adequate to support a conclusion" and it "consists of more than a mere scintilla of evidence but may be less than a preponderance." *Id.* (citation omitted). Significantly, in reviewing for substantial evidence, the court must not "undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]" and "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [ALJ]." *Id.* Furthermore, the ALJ

is solely responsible for assessing a claimant's RFC. 20 C.F.R. § 416.946(c).

Here, Claimant contends that the ALJ failed to appreciate the severity of her impairments in assessing her RFC, including the severity of her alleged mental conditions. While Claimant's challenge directly addresses the ALJ's RFC finding, the ALJ's discussion of Claimant's mental impairments began at the second step of the sequential evaluation. At step two, the ALJ performed the special technique provided in 20 C.F.R. § 416.920a to assess whether Claimant had any severe mental impairments. (Tr. at 14-15). The ALJ noted that despite Claimant's allegations of depression and anxiety, she successfully lived alone for the majority of the relevant period; performed activities of daily living; did not receive any specialized mental health treatment; did not voice any persistent mental health complaints to her providers; did not exhibit any difficulty interacting with her medical providers or in the administrative hearing; reported spending most of her day watching television with no indication of limited focus or concentration; managed her appointments and maintained a regular schedule; and, finally, she stated that she stopped working due to physical limitations, rather than mental health concerns. (*Id.*). Also, the ALJ noted that Claimant's mental health symptoms showed improvement with medication and, even after Claimant discontinued taking medication, the record did not suggest that her functional abilities decreased or her symptoms worsened. (Tr. at 15). Therefore, the ALJ concluded that Claimant had nothing more than mild functional limitations and that her mental impairments were non-severe. (Tr. at 14-15).

Nevertheless, because Claimant had other severe impairments, the ALJ proceeded to the subsequent steps of the sequential evaluation, comparing Claimant's impairments to the Listing, and then evaluating Claimant's RFC. As to Claimant's mental health

complaints, the ALJ noted that Claimant did not receive any specialized mental health treatment, no longer took medications, and participated in a range of daily activities. (Tr. at 17, 19). The ALJ also considered Claimant's allegations regarding her physical impairments, including her testimony that she suffered from back pain every day for twenty-one years; had breathing restrictions due to COPD; and had a limited ability to lift, stand, sit, and walk. (Tr. at 16-17). Yet, the ALJ found that the objective medical evidence was not illustrative of debilitating impairments. (Tr. at 17).

As to Claimant's back pain, the ALJ considered the radiographic evidence, noting, *inter alia*, that Claimant's x-rays in March 2013 showed only some progression in cervical and lumbar degenerative changes, mild thoracic degenerative changes, and stable lumbar scoliosis. (*Id.*). The ALJ stated that although Claimant exhibited positive straight leg raising results on examination in 2014, the results were not consistent, and Claimant was treated conservatively for her pain complaints. (*Id.*). Further, Claimant was referred for physical therapy and pain management, but Claimant received only one nerve block in January 2014 before being discharged from the program due to repeated cancelation of appointments. (*Id.*). The ALJ also considered that Claimant's primary care physician, Dr. Gillenwater, with whom Claimant began treating in April 2014, prescribed only Neurontin for Claimant's pain. Claimant returned in June 2014 reporting significant improvement, although she walked a lot the previous day, somewhat exacerbating her pain; therefore, Claimant was given Ultram and a muscle relaxer. (*Id.*). The ALJ concluded that Claimant's records in July 2014 showed that Claimant's symptoms remained improved. Later, in November 2014, when Claimant requested an increase in medication, her new primary care physician, Dr. Steele, advised against an increase in medication and instead gave Claimant a steroid injection in her back. (Tr. at 18). The ALJ cited that the record

contained no further treatment for Claimant's back pain after November 2014. (*Id.*).

As to Claimant's breathing restrictions, the ALJ noted that although the record confirmed significant COPD, Claimant was treated conservatively, including walking daily; also, Claimant continued to smoke with no sustained desire to quit. The objective evidence did not reflect debilitating breathing problems, and Claimant was non-compliant with treatment by periodically failing to use her supplemental oxygen at night. (Tr. at 18). The ALJ discussed that Claimant's most recent spirometry results showed only mild obstruction. Her earlier spirometry test taken in June 2013 showed moderate obstruction, but was done when Claimant was living in a trailer without air conditioning, which exacerbated her breathing problems. In addition, she was not using supplemental oxygen at night. (*Id.*). The ALJ observed that despite Claimant's continued smoking and non-compliance, she remained active and walked her dog approximately one mile several times per week. She used a rescue inhaler three to four times per week without frequent exacerbations of shortness of breath, respiratory infections, or hospitalizations. (*Id.*).

The ALJ also weighed the medical source opinions in assessing Claimant's RFC. In regard to Dr. Wahi's consultative examination performed in March 2013, the ALJ pointed to Claimant's report that she could lift up to 20 pounds, had no significant limitation in her ability to sit, and spent most of her time sitting and watching television. (Tr. at 19). The ALJ also cited to the imaging of Claimant's left knee, taken as part of the consultative examination, which showed no significant degenerative process. Moreover, the pulmonary function study performed by Dr. Wahi showed only mild restrictive pulmonary disease. (*Id.*). The ALJ considered Dr. Wahi's opinion that Claimant had severe COPD, asthma, and degenerative joint disease of multiple joints with reduced range of motion in her lumbar spine and a limited ability to walk and stand, but

discounted it, indicating that Dr. Wahi provided no specific analysis of Claimant's functional abilities, except to comment that she could walk without assistive devices and could perform all activities of daily living. (*Id.*). Given the inconsistency between Dr. Wahi's diagnoses and his findings, his statements regarding Claimant's mobility, and his lack of a detailed functional assessment, the ALJ found Dr. Wahi's report to be of little value. (*Id.*).

The ALJ also reviewed the report of consultative psychologist, Mr. Sargent, who examined Claimant in March 2013 and found her to have pain disorder, major depressive disorder, generalized anxiety disorder, and a poor prognosis. The ALJ afforded Mr. Sargent's opinions little weight for various reasons; including, the timing of the opinions (prior to alleged disability onset), Claimant's self-reported ability to perform personal care and household activities, the lack of mental health treatment, the lack of uncontrolled mental health symptoms in the treatment records, and Claimant's decision to stop taking psychotropic medications, suggesting that her psychological symptoms were not significantly limiting. (*Id.*).

Finally, as to the state agency consultants' psychological assessments, the ALJ noted that the consultants gave controlling weight to the prior ALJ's findings that Claimant was moderately limited in maintaining concentration, persistence, or pace, which restricted Claimant to one-to-two step work activity. (*Id.*). However, the ALJ found that new and material evidence submitted after the prior determination did not support such severe mental impairment. (*Id.*). Further, although the state agency physicians found that Claimant was capable of medium work, the ALJ determined that Claimant's combination of impairments supported a reduced restriction to light level work. (*Id.*).

Given all of the above considerations, the ALJ concluded that Claimant had the

RFC to perform a range of light work in which Claimant was restricted to sitting for no more than 60 minutes at one time and standing or walking for no more than 30 to 60 minutes at one time. (Tr. at 16). The ALJ further limited Claimant's RFC to occasional postural activities and no concentrated exposure to certain environmental factors. (*Id.*). The ALJ explained that the ability to alternate between sitting and standing and limited exposure to environmental elements and hazards accounted for Claimant's breathing and spinal conditions and pain. (Tr. at 18-19).

Under the deferential "substantial evidence" standard, the undersigned **FINDS** that the record supports the ALJ's RFC assessment and decision. As summarized above, the ALJ articulated a thorough and well-supported analysis of Claimant's allegations, the objective evidence, and the expert opinions in the record. The ALJ analyzed Claimant's abilities on a function-by-function basis, particularly focusing on the functions which presented the most conflict between Claimant's allegations, the objective evidence, and the expert opinions; including, Claimant's ability to sit, stand, walk, and lift. (Tr. at 16-19). While Claimant argues that a "reasonable review of the evidence" supports a conclusion that her impairments precluded all work activity or, at a minimum, limited her to sedentary work, Claimant does not cite any specific deficiencies in the ALJ's decision. Rather, Claimant is asking the Court to re-weigh the evidence and substitute its analysis for that of the ALJ; tasks which are clearly outside of the authority of this Court in reviewing the agency's decision.

The ALJ very clearly applied the relevant legal standards to the record before him. He appropriately analyzed and discussed all of the pertinent conflicts in the evidence and crafted Claimant's RFC based on his evaluation of Claimant's medical records and statements. Although Claimant, the undersigned, or any other person could theoretically

interpret the evidence differently and reach varying conclusions, the Court's role is restricted to simply determining whether the ALJ's findings and ultimate decision were supported by substantial evidence. In this case, while Claimant expressed debilitating symptoms, her records, including some of her own statements to physicians, substantially support the ALJ's findings.

As to Claimant's complaints of back and joint pain, Claimant's x-rays showed degenerative changes in her spine; she had some positive straight leg raising tests on examination; and she demonstrated some palpable trigger points and paraspinal muscle spasms. (Tr. at 511, 514, 522-23, 528, 814, 886-88). However, her nerve conduction and electromyography studies revealed normal results in July 2013. (Tr. at 870-71). Claimant received some physical therapy prior to the relevant period and was otherwise treated only by medication, one session of nerve blocks, and a steroid injection. In fact, Claimant was referred to pain management for her back pain in December 2013, but she was dismissed from the program after only one session because she repeatedly canceled or failed to appear for her appointments. (Tr. at 836, 841, 847-53). During Claimant's consultative examination in March 2013, she stated that she could not stand for more than 30 minutes, but had no significant limitation in her ability to sit, and could lift 20 pounds. (Tr. at 497). These functional abilities appear to be consistent with the ALJ's RFC finding. Further, at that examination, Claimant had a normal range of motion in her extremities, normal gait and station, and could get on and off of the examination table. (499.). She had no restriction in range of motion in her cervical spine, but some loss of motion in her lumbar spine. (Tr. at 499). There is no indication that Claimant's condition subsequently deteriorated. As late as April 17, 2015, Claimant consistently walked her dog up to a mile; lived alone since her divorce two years earlier; performed her own activities

of daily living; and continued to drive and go out in public. (Tr. at 46, 50-51, 55). Notably, Claimant testified that if she could take periodic breaks from sitting, she could probably resume whatever task that she was doing. (Tr. at 48). Also, Claimant sat through the supplemental administrative hearing in April 2015 for at least 40 minutes. (Tr. at 61).

Regarding Claimant's COPD, although she had some mild-to-moderate decreased breath sounds on examination and required supplemental oxygen at night, she consistently reported that her shortness of breath remained stable, the measured oxygen saturation in her blood always exceeded 90 percent, and, as noted, she was able to take long walks with her dog multiple times per week, live alone, and independently perform activities of daily living. (Tr. at 511, 513-14, 528, 919, 923-25, 857-58, 933-35, 938-39, 941-43, 950-51). Furthermore, despite the fact that Claimant continued to smoke, her pulmonary function tests in August 2014 showed only very mild obstructive ventilator defect. (Tr. at 502-05, 856, 952). Finally, the record is fairly unremarkable regarding Claimant's mental impairments. Claimant did not see any mental health providers, receive specialized mental health treatment or counseling, or voice any significant mental health concerns, and she ceased taking medication for mental impairments in November 2014 without any subsequent evidence of worsening symptoms.

Claimant contends that her impairments are so severe that they preclude all work activity or permit her to perform work only at the sedentary exertional level. She also states that her impairments would cause her to be absent or off-task is excess of acceptable tolerances. However, it is unclear which evidence informs Claimant's conclusions other than her own allegations. (ECF No. 9 at 5-6). The state agency non-examining experts found in April and September 2013 that Claimant was capable of medium work. (Tr. at 134, 154). Dr. Wahi, who performed a consultative examination of

Claimant in March 2013, found that Claimant's respiratory examination was normal and Claimant had only "very mild" restrictive pulmonary disease. (Tr. at 498, 502-05). Further, Dr. Wahi stated that although Claimant had some loss of motion in her lumbar spine, which decreased her ability to walk and stand, she walked without an assistive device and was able to perform her activities of daily living. (Tr. at 500). None of the experts in this matter suggested that Claimant was limited to work at the sedentary exertional level. Further, while the state agency psychological experts found that Claimant had some moderate functional limitations, the experts clearly stated that their opinions were based on the prior ALJ's decision to which the experts gave controlling weight. (Tr. at 137-38, 150-51, 156). By contrast, the consultative psychologist found on examination in March 2013 that Claimant had, at most, mildly deficient mental functional limitations other than her recent memory, which was moderately limited. (Tr. at 453). As discussed, the ALJ's decision demonstrates that the ALJ considered the complete record in this matter and specifically addressed and reconciled any conflicts in the record, including all of the above expert opinions.

After a thorough review of the ALJ's decision and the transcript of proceedings, the undersigned **FINDS** for all of the reasons stated above that the ALJ's RFC assessment is supported by substantial evidence and **RECOMMENDS** that the presiding District Judge affirm the Commissioner's decision.

## VIII. <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the presiding District Judge confirm and accept the findings herein and **RECOMMENDS** that the District Judge **DENY** Plaintiff's request for judgment on the pleadings, (ECF No. 9); **GRANT** Defendant's request to affirm the

decision of the Commissioner, (ECF No. 10); and **DISMISS** this action from the docket of the Court. The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (if received by mail) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown. Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Judge and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** October 4, 2017

Cheryl A. Eifert
United States Magistrate Judge